DANIEL BLACK,

       Plaintiff,

  v.

DAVID A. CLARKE, JR., et al.

       Defendants.

Civil Action No. 2:17-cv-00156

**PROPOSED FINDINGS OF FACT IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Civil L.R. 56(b) of the United States District Court for the Eastern District of Wisconsin, defendants, David A. Clarke, Jr. and Milwaukee County, respectfully submit the following proposed findings of fact in support of their motion for summary judgment.

**I.    THE PARTIES.**

1.    Plaintiff Daniel Black is an adult resident of the State of Wisconsin. (Declaration of Kurt M. Simatic ("Simatic Decl."), Ex. A at 21:19-20.)

2.    Black is six feet, four inches in height, and weighs approximately 257 lbs. (*Id.* at 9:6-11.)

3.    Black played rugby for several months while in college at the University of Wisconsin-Milwaukee. (*Id.* at 11:13-17.)

4.    Black graduated from college in December 2016. (*Id.* at 11:7-8.)

5.    Defendant Milwaukee County is a municipal corporation organized under the laws of the State of Wisconsin. (Compl., ECF No. 1, ¶ 4; Am. Answer of Milwaukee County and Sheriff David A. Clarke, Jr., ECF No. 11, ¶ 4.)

6. Defendant David A. Clarke, Jr. was the duly elected Milwaukee County Sheriff on January 15, 2017. (Compl., ECF No. 1, ¶ 4; Am. Answer of Milwaukee County and Sheriff David A. Clarke, Jr., ECF No. 11, ¶ 4.)

## II. PREVIOUS THREATS AGAINST CLARKE.

7. During his tenure as sheriff, Clarke received numerous threats against his physical safety. During the one-year period between July 2016 and July 2017, Clarke received at least 25 threats of physical violence and expressions of hatred. (Declaration of Brian Barkow, Ex. A.)

8. For example, on July 20, 2016, an individual called the Milwaukee County Sheriff's Office and stated that the "Black Guerilla Family" is coming to Milwaukee to "get" Clarke. (*Id.*)

9. As another example, on August 14, 2016, an individual on the social media app Instagram offered $100 to "the first person to peel the Sheriff's cap back." (*Id.*)

10. Additionally, on August 17, 2016, an individual on the social media program Facebook asked, "Can someone please go take target practice on" President Trump and Clarke. (*Id.*)

11. The Sheriff's Office maintains a matrix which records some of the threats and expressions of hate directed at Clarke. (*Id.*)

## III. PRIOR UNPROVOKED CONFRONTATIONS INVOLVING CLARKE AT AIRPORTS AND ON AIRPLANE.

12. During his tenure as sheriff, Clarke has had several, unprovoked confrontations with members of the public at airports or on an airplane. (Declaration of David A. Clarke, Jr. ("Clarke Decl."), ¶ 5.)

13. On September 24, 2016, Clarke was verbally berated by an intoxicated passenger throughout a flight from Milwaukee to Charlotte, North Carolina. (*Id.* ¶ 6.)

14. On December 20, 2016, Clarke was verbally berated by a female individual while waiting to board an airplane at the Dallas/Fort Worth International Airport. The individual's verbal attacks escalated in intensity, and at one point she said, "We will find you and we will get you." Dallas Police officers responded to the scene. (*Id.* ¶ 7.)

## IV. JANUARY 15, 2017 INCIDENT ON AMERICAN AIRLINES FLIGHT 1534.

15. On January 15, 2017, Clarke boarded American Airlines Flight 1534 at the Dallas/Fort Worth International Airport bound for Milwaukee. (*Id.* ¶ 8, Simatic Decl., Ex. C.)

16. Clarke took his seat in the front section of the airplane on the aisle. (Clarke Decl., ¶ 9; Simatic Decl. Ex. A at 19:14-18.)

17. At some point after Clarke boarded the airplane, Black boarded the plane. (Simatic Decl., Ex. A at 19:14-18.)

18. Black stopped in the aisle immediately adjacent to Clarke's seat. (Clarke Decl. ¶ 10; Simatic Decl., Ex. A at 19:14-24.)

19. Black asked Clarke if he was Sheriff Clarke. (Clarke Decl. ¶ 11; Simatic Decl., Ex. A at 19:14-21.)

20. Clarke responded to Black in the affirmative. (Clarke Decl. ¶ 11; Simatic Decl., Ex. A at 19:24.)

21. Black then, while standing over Clarke and in very close proximity to Clarke given the confines of the airplane cabin, and in a physically threatening manner, stared at Clarke and shook his head at him for a prolonged period of time before continuing to walk to the back of the airplane. (ROG Responses at 5, Black depo at 20:3, 17-19.)

22. While walking to the back of the airplane, Clarke asked Black if he had a problem. (Clarke Decl. ¶ 12; Simatic Decl., Ex. A at 20:3, 17-19.)

23. In response to Clarke's question, Black turned around, stared at him for a couple of seconds, shook his head again and waved Clarke off in a manner of "displeasure." (Clarke Decl. ¶ 13; Simatic Decl., Ex. A at 20:5-15; *id.* Ex. L.)

24. Clarke and Black did not have any additional interaction during the flight. (Simatic Decl., Ex. A at 23:4-6.)

25. Before the airplane took off, Clarke used his cellular phone to call Inspector Edward Bailey. (Clarke Decl. ¶ 14; Simatic Decl., Ex. E at 10:18-25.)

26. On January 15, 2017, Bailey was employed with the Milwaukee County Sheriff's Office. (Simatic Decl., Ex. E at 3:22 – 4:4.)

27. Bailey's duties included, among other things, serving as the sheriff's adjutant officer and ordinarily meeting Clarke when he arrived at the airport from an out-of-state trip. (Bailey Depo at 6:7-13; 10:14-17.)

28. Clarke informed Bailey of the incident with Black on the airplane. Specifically, Clarke told Bailey that "it had happened again" and that he had had "a confrontation with a passenger on an aircraft." (*Id.* at 6:7-13; 10:14-17.)

29. Clarke specified to Bailey that the confrontation had not been physical and described the passenger as male and wearing a safari hat. (*Id.* at 11:2-4.)

30. Clarke further told Bailey that the confrontation did not rise to the level of an arrest or citation but that Clarke wanted a field interview of Black. (*Id.* at 11:25 – 12:3.)

31. A field interview is a voluntary police-citizen encounter in which an officer obtains information from a citizen and makes an identification of the citizen. (Simatic Decl., Ex. F at 10:23-24; *id.*, Ex. G at 35:13-17.)

32. A field interview is different from a "*Terry* stop," in which a citizen is questioned and patted down by an officer for weapons. (Simatic Decl., Ex. F at 25:7-10: *id.*, Ex. G at 35:9-11.)

33. After Bailey ended his phone call with Clarke, Bailey immediately called Captain Mark Witek. (Simatic Decl., Ex. E at 12:7.)

34. Captain Witek oversees the Mitchell International Airport division of the Milwaukee County Sheriff's Office. (Simatic Decl., Ex. F at 8:4-7.)

35. Captain Witek's duties include, among other things, meeting Clarke when he flies in and out of Mitchell International Airport. (*Id.* at 8:20-25.)

36. Bailey relayed to Witek the information he learned in his phone call with Clarke and confirmed that Witek would be present at the flight gate to meet Clarke. (Simatic Decl., Ex. E at 12:8-25.)

37. Bailey also relayed to Witek Clarke's order to have deputies conduct a field interview of Black after the plane lands in Milwaukee. (Simatic Decl., Ex. F at 9:20-22.)

38. Before the airplane left Dallas, Clarke also separately contacted Witek by text message. (Clarke Decl. ¶ 16; Simatic Decl., Ex. F at 18:2-25; 22:13-15.)

39. Consistent with his request to Bailey, Clarke requested that Witek have deputies conduct a field interview of Black after the plane landed in Milwaukee. (Clarke Decl. ¶ 16; Simatic Decl., Ex. F at 22:13-15.)

40. Before the plane landed in Milwaukee, a flight crew member contacted American Airlines personnel at Mitchell International Airport and stated that three passengers were not being respectful toward Clarke. (Simatic Decl., Ex D.)

41. An American Airline employee relayed this information about three rude and disrespectful passengers to the Airport Division of the Milwaukee County Sheriff's Office. (*Id.*)

5

MIL-28772992-2
Case 2:17-cv-00156-JPS    Filed 09/11/17    Page 5 of 10    Document 17

## V. FIELD INTERVIEW OF BLACK AT AIRPORT.

42. Captain Witek ordered Deputies Paull and Hartung to conduct the field interview of Black to only identify him and obtain basic information. (Simatic Decl., Ex. G at 6:3-5; *id.*, Ex. I at 8:1-19.)

43. Captain Witek relayed to Deputies Paull and Hartung that there was an individual on Clarke's flight that was possibly harassing him, as had happened on previous flights. (Simatic Decl., Ex. F at 26:1-17; *id.*, Ex. G at 5:10-12, 15:1-10.)

44. At some point before conducting the field interview, Deputies Paull and Hartung agreed that Deputy Paull would talk to Black while Deputy Hartung would ask the sheriff's airport dispatch to run a search for Black's name to confirm his identity. (Simatic Decl., Ex. I at 8:16-19.)

45. Deputies Paull and Hartung further discussed that they wanted to "just get [Black] identified and be done with it." (*Id.* at 9:19-20.)

46. When Clarke flew in to Mitchell International Airport during his tenure as sheriff, he was customarily met by Captain Witek, Inspector Bailey, a sergeant, and a canine handler with her dog at the airport when he deplaned. (Simatic Decl. Ex. F at 8:20-25.)

47. After the airplane landed at Mitchell International Airport on Sunday afternoon, January 15, 2017, Clarke exited the airplane via jet bridge, entered the concourse at Gate D54, and walked up to several Milwaukee County Sheriff's Office personnel. (Simatic Decl., Ex. F at 23:11-12; *id.*, Ex. G at 7:8.)

48. Clarke was met by Captain Witek, Sergeant James Sajdowitz, Deputy Karen Mills and her dog, and Deputies Steven Paull and Jeffrey Hartung. (Simatic Decl., Ex. F at 23:7-9.)

49. Deputies Paull and Hartung were only in the gate area because of the request to field interview Black. (Simatic Decl., Ex. G at 6:3-5; *id.*, Ex. I at 8:1-19.)

50. Clarke stayed in the gate area with the other Milwaukee County Sheriff's Department personnel until Black exited the airplane via the jet bridge and entered the concourse. (Simatic Decl., Ex. G at 8:12-18.)

51. When Black entered the concourse, Clarke identified him to Captain Witek and Deputies Paull and Hartung. (*Id.*)

52. After identifying Black, Clarke, Witek, Sajdowitz, and Mills immediately left the gate area and had no further interaction with Black. (*Id.* at 8:18-21.)

53. Deputies Paull and Hartung both approached Black. (Simatic Decl., Ex. I 10:20-23.)

54. Deputy Paull approached Black by meeting him at his left side, identified himself, and that he needed to speak with Black about an incident with Clark on the airplane. (Simatic Decl., Ex. G at 9:4-8; 11:12-13 & 18.)

55. Deputy Hartung approached Black from behind. (Simatic Decl., Ex. I at 12:15.)

56. Deputy Paull then explained to Black that he and Deputy Hartung were "just going to talk to him," but wanted to talk to Black in an area that was not as confined and crowded as the gate area. (Simatic Decl., Ex. G at 8:25, 9:16-19; *id.*, Ex. I at 12:23-25.)

57. Deputies Paull and Hartung accompanied Black to an "open area" at the center of Concourse D, near a coffee stand, to talk to Black. (Simatic Decl., Ex. G at 9:20-25; 10:9.)

58. As they walked with Black, Deputy Paull was walking several feet on Black's left and Deputy Hartung was behind Deputy Paull. (*Id.* at 11:18, 12:11.)

59. When the deputies and Black arrived in an open area of the concourse, the deputies asked Black for proof of his identity. (*Id.* at 13:18-19.)

60. Black gave the deputies his Illinois driver's license. (*Id.* at 13:19-20.)

7

61. Deputy Hartung took Black's driver's license and gave his information on the driver's license to dispatch to check for any outstanding warrants. (*Id.* at 13:20-22.)

62. Checking an individual's name for any outstanding warrants is standard when deputies receive a complaint about someone. (*Id.* at 14:22-24.)

63. Deputy Hartung had to give dispatch Black's information a second time and this caused the check by dispatch to take longer. (Simatic Decl., Ex. I at 17:14-20.)

64. Deputy Paull asked Black to describe what happened on the flight with Clarke. (Simatic Decl., Ex. G at 21:1-2.)

65. Black relayed to the deputies an account of what happened on the plane. (*Id.* at 21:2-13; *id.*, Ex. H; Ex. I at 13:20-14:18.)

66. Based on his limited understanding of what happened on the flight with Clarke, and based on his knowledge of Clarke's previous confrontations on an airplane and at an airport, Deputy Paull was skeptical that Black's account of his interaction with Clarke was complete. As a result, he asked Black if he had "do[ne] anything else" toward Clarke. (Simatic Decl., Ex. G at 20:7-24; 21:16-21.)

67. Black called the situation "ridiculous," and Deputy Paull agreed. (*Id.* at 22:4-6.)

68. Deputy Paull asked Black what he thought of Clarke, and Black responded, "No comment." (Simatic Decl., Ex. I at 31:9-14.)

69. Deputy Paull and Black then discussed other topics, such as where Black was coming from and where he went to college. (Simatic Decl., Ex. G at 23:5-15.)

70. Deputies Paull and Hartung both attended the University of Wisconsin-Milwaukee, like Black, and the three of them discussed their time there, including parties and bars they attended. (*Id.* at 23:5-15.)

8

71. Deputy Hartung played rugby at the University of Wisconsin-Milwaukee, like Black, and the three of them then discussed rugby. (*Id.* at 23:12-15.)

72. When the field interview concluded, the deputies escorted Black through the airport and outside to a waiting car driven by a friend. (Simatic Decl., Ex. A at 31:2-12.)

73. While walking with Black to the outside of the airport, Deputy Paull was approximately ten feet in front of him and Deputy Hartung was several feet behind him. (Simatic Decl., Ex. I at 20:18-23, *id.*, Ex. K; *id.*, Ex. Q.)

74. The field interview lasted approximately no more than 15 minutes. (Simatic Decl., Ex. C; *id.*, Ex. G at 26:7-10; *id.*, Ex. J; *id.*, Ex. K.)

75. The deputies did not tell Black he was free to leave, nor did Black ask if he was free to leave. (Simatic Decl., Ex. G at 28:2-6.)

76. During the field interview, Black used his cell phone to communicate with a friend who planned to pick Black up at the airport. (Simatic Decl., Ex. A at 31:13-23; *id.*, Ex. I at 19:20-23.)

77. Black filmed video of himself on his cell phone walking out of the airport and the deputies walking some distance away from him, and the deputies did not prevent Black from filming. (Simatic Decl., Ex. Q.)

78. Deputy Paull did not believe that he had to "grill" Black during the field interview because Black was cooperative. (Simatic Decl., Ex. G at 25:25 – 26:1.)

79. Black described the deputies who questioned him as "extremely kind." (Simatic Decl., Ex. A at 8:1-2.)

80. Black did not refuse to answer questions and was "trying to be helpful." (*Id.* at 29:14-16.)

9

81. From the time that Black exited the jet bridge to the time that his friend picked him up at the airport was approximately 25 minutes. (Simatic Decl., Ex. G at 26:11-15.)

82. Black and his friend left the airport and went to eat at a Wing Stop restaurant before going home to watch the Packer game on television. (Simatic Decl., Ex. A at 34:4-10.)

## VI. BLACK AND HIS ATTORNEY SEEK PUBLICITY FOR THIS LAWSUIT.

83. Black and his attorney have sought publicity for Black's lawsuit against Clarke and Milwaukee County. (Simatic Decl., Exs. M, N, & O.)

84. Before arriving at Wing Stop, Black posted about his interaction with Clarke and the deputies on social media. (Simatic Decl., Ex. A at 51:18 – 52:18.)

85. On February 2, 2017, Black's attorney emailed a copy of Black's Complaint in this lawsuit to 14 news organizations. (Simatic Decl., Ex. M.)

86. On February 2, 2017, Black gave interviews to WTMJ Channel 4 and FOX Channel 6 from his attorney's office. (Simatic Decl., Exs. N & O.)

Dated this 11th day of September, 2017.

s/ Charles H. Bohl
Charles H. Bohl
Andrew A. Jones
Kurt M. Simatic

Attorneys for Milwaukee County and David A. Clarke, Jr.

HUSCH BLACKWELL LLP
555 East Wells Street, Suite 1900
Milwaukee, Wisconsin 53202-3819
Telephone: 414-273-2100
Fax: 414-223-5000
Email: Charles.Bohl@huschblackwell.com
Email: Andrew.Jones@huschblackwell.com
Email: Kurt.Simatic@huschblackwell.com