UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DANIEL BLACK,

        Plaintiff,

v.                                         Case No. 2:17-cv-00156

DAVID CLARKE,

And

COUNTY OF MILWAUKEE, WISCONSIN,

        Defendants.

---

**BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
BY PLAINTIFF DANIEL BLACK**

---

Before

The Honorable J.P. Stadtmueller
U.S. District Court Judge

<u>For the Plaintiff</u>

William F. Sulton, Esq.

PETERSON, JOHNSON & MURRAY, S.C.
788 North Jefferson Street, Suite 500
Milwaukee, Wisconsin 53202
Telephone: 414-278-8800
Facsimile: 414-278-0920
Email: wsulton@pjmlaw.com

Date: October 11, 2017.

COMES NOW Plaintiff Daniel Black ("Black"), by his attorney William F. Sulton, Esq., of the law firm of Peterson, Johnson & Murray, S.C., and submits this brief in opposition to Defendants Milwaukee County Sheriff David Clarke ("Sheriff Clarke") and County of Milwaukee, Wisconsin's ("Milwaukee County") motion for summary judgment.

## 1.    INTRODUCTION

Sheriff Clarke ordered subordinates to harass Black for shaking his head. Black filed a formal complaint with Milwaukee County.  Sheriff Clarke got word of the complaint and took to social media to dissuade Black from pursuing the complaint by threatening and ridiculing him and encouraging others to the same. That conduct clearly violates the First,[1] Fourth and Fourteenth Amendments to the U.S. Constitution.

## 2.    FACTS RELEVANT TO THE MOTION[2]

Black boarded a plane in Dallas, Texas, traveling to Milwaukee, Wisconsin. While boarding, Black noticed a man he thought looked like Sheriff Clarke.  Black asked the man whether he was Sheriff Clarke.  Sheriff Clarke said he was indeed the sheriff.  Black then shook his head and began walking down the aisle.  Sheriff Clarke asked, rhetorically, do we have a problem?  Black walked to his seat in row

---

[1] Defendants may complain that the complaint does not use the words "First Amendment" or "due process."  In *Estate of Perry v. Wenzel*, No. 16-2353 (7th Cir. Sep. 18, 2017), the Seventh Circuit rejected a similar argument advanced by the same defense counsel as "without merit" because there is no duty to plead legal theories.  *Id.* at 18.

[2] These facts are taken from plaintiff's proposed findings of fact (Dkt. #26).

18 and sat down. Sheriff Clarke was sitting in first class. Black and Sheriff Clarke had no other interaction.

As Black exited the plane, hours later, he was confronted by Deputies Steven Paull ("Deputy Paull") and Jeffrey Hartung ("Deputy Hartung"). Sheriff Clarke, Captain Mark Witek ("Captain Witek"), Sergeant James Sajdowitz ("Sergeant Sajdowitz"), and Deputy Karen Mills ("Mills") and her K-9 dog were also present—reinforcing the show of force. Deputies Paull and Hartung told Black they needed to speak with him and he needed to go with them. The deputies bracketed Black (one in front, the other in back) and escorted Black to an area where there were no passersby, no cameras and was not open to the public.

Deputy Paull commanded Black to drop his bag. Black complied. Deputy Hartung commanded Black to present photo identification. Black presented his Illinois driver's license. Deputy Paull harangued Black, a recent University of Wisconsin-Milwaukee graduate, about not having a Wisconsin driver's license. Deputy Hartung radioed for a warrant check. Deputy Paull asked Black about his interaction with Sheriff Clarke and his political views of the sheriff.

Black was not free to leave. He was interrogated for 25 minutes or more. During the interrogation Black told the deputies his friend was waiting for him. Black asked whether he could leave and the deputies told Black that he needed to wait. The deputies eventually escorted Black out of the airport.

Earlier, Sheriff Clarke sent a text message to Captain Witek. Sheriff Clarke ordered Captain Witek to have a couple of deputies harass Black:

"Question for him is why he said anything to me. Why didn't he just keep his mouth shut?" Prior that order Sheriff Clarke told Inspector Edward Bailey ("Inspector Bailey"), the number two in his department, that Black had not done anything that "rise[s] to the level of a citation or arrest." Moreover, Deputy Hartung did not believe Black had been disruptive on the airplane at the time he stopped him. Notably, Deputies Paull and Hartung have been deputies for more than 20 years and cannot remember receiving any training on reasonable suspicion other than at the academy more than 20 years ago.

| Deputy Hartung | Deputy Paull |
|---|---|
| Q Do you recall receiving any reasonable-suspicion training? **A No, not specifically.** Q Do you recall having received any training on Terry stops? **A I don't -- not specifically, no.** Q Do you recall any training on field interviews? **A No.** . . . Q What is your current rank? **A Deputy sheriff one.** Q And how long have you held that rank? **A 22 years.** | Q Sure. When was the last time you remember receiving reasonable-suspicion training? **A I couldn't tell you.** . . . Q Okay. Have you done any hands-on training relating to conducting stops or reasonable suspicion? **A Reasonable suspicion, no. Just basic traffic stops, yes.** Q Okay. What about nontraffic stops? **A At in-service training?** Q At any training you can think of. **A Maybe back in the academy, but like I said, that was a long time ago.** Q So you don't remember receiving any training on conducting stops outside of traffic stops since the academy? **A Hands on? I don't recall recently. But I said we've done a lot of -- with the online modules.** Q And can you remember any online modules? |

| | A No. |
| --- | --- |
| | . . . |
| | Q Sure, sure. What is your current rank? |
| | A Deputy sheriff with the Milwaukee County Sheriff's Office. |
| | Q And how long have you held that rank? |
| | A Been a deputy sheriff since November of 1992. |

Black filed a complaint with the county about his experience. Sheriff Clarke responded to the complaint by taking to social media to ridicule and threaten Black and encourage others to do the same. For example, Sheriff Clarke called Black a "snowflake" and stated "you wouldn't be around to whine about it." The term *snowflake* is a common racial slur hurled at Jewish people. See *Snowflake*. The Racial Slur Database (available at http://www.rsdb.org/race/jews (visited Jul. 7., 2017)) Unsurprisingly, Black has been subjected to a torrent of hatred. Below is an example.

9:19 PM



fucktard idiot... hope you die in a car accident...

3. **ARGUMENT**

42 U.S.C. § 1983 anticipates that a government official will be "responsible for the natural consequences of his actions." *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)); see also *Berg v. County of Allegheny*, 219 F.3d 261, 272 (3rd Cir. 2000) ("A government official's liability for causing an arrest is the same as for carrying it out." (internal quotation marks omitted)). *Staub v. Proctor Hosp.*, ___ U.S. ___, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011), explains that "when Congress creates a federal tort it adopts the background of general tort law," including "the traditional tort-law concept of proximate cause." *Id.* at 1191, 1193. 42 U.S.C. § 1983 is a general tort law. Thus, "[p]roximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged. . . .'" *Id.* at 1192. In other words, individual liability under § 1983 is appropriate where the "individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). § 1983 should "be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe*, 365 U.S. at 187.

3.1 **BLACK WAS "SEIZED" WITHIN THE MEANING OF THE FOURTH AMENDMENT.**

In *United States v. Mendenhall*, 446 U.S. 544 (1980), Justice Stewart defined a seizure as "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

*Id.* at 554 (Opinion of Stewart, J.). Justice Stewart offered the following examples: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* In *Florida v. Royer*, 460 U.S. 491 (1983), a plurality of the U.S. Supreme Court adopted Justice Stewart's opinion. And in *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988), a majority adopted Justice Stewart's opinion.

As Black deplaned, Deputies Paull and Hartung immediately stopped Black and stated that they needed to speak with Black and Black needed to come with them. (Dkt. #25-6 at 11:59 ("I kind of stopped him there.") Sheriff Clarke, Captain Witek, Sergeant Sadjowitz, Deputy Mills and her K-9 dog reinforced the commands. Video footage from the airport concourse shows Deputies Paull and Hartung bracketing Black (one in front, the other in back) as they escorted him down the concourse. The footage shows that Black is visibly upset; he does not want to go with them.

Deputies Paull and Hartung took Black to an area where there were no passersby and no cameras. This was not an area open to the general public. The deputies commanded Black to drop his luggage and present photo identification. Black handed over his Illinois driver's license. Deputy Hartung radioed for a warrant check. Deputy Paull harangued Black for not having a Wisconsin driver's license and asked about his political views. Black told the deputies that his friend was waiting and that "I'd like to go." (Dkt. #26 at ¶20.) The deputies told Black

that "he had to wait." Deputy Hartung testified that Captain Witek told him to "stay" with Black and "so we stayed." (Dkt. #26-7 at 18:1-9.) And the field interview narrative report maintained by the sheriff's office states that Black was "warned" and "released." (Dkt. #25-10.)

The term "field interview" is a term of art in law enforcement. It means *Terry* stop, i.e., a stop based on reasonable suspicion.

| Sergeant James Sajdowitz | Deputy Karen Mills | Deputy Steven Paull | Deputy Jeffrey Hartung |
|---|---|---|---|
| The term "field interview," right, that's a term that you customarily use in your profession, right? **A Correct.** Q And what I want to know is, is that different than a Terry stop? **A No.** Q Okay. So field interview is synonymous with Terry stop, right? **A Correct.** | Q Do you know what I mean when I say "Terry stop"? **A Yes.** Q Is a field interview a Terry stop? **A Yes.** Q Okay. So was it your understanding that when Captain Witek said, you know, field interview this individual that, you know, they needed reasonable suspicion in order to stop him, right? **A Yes.** | Q Do you believe that you need reasonable suspicion to conduct a field interview? **A Reasonable suspicion?** Q Yeah. **A Yes.** | Q Is a field interview a term that you use in your department? **A Field interview, no. FI stop, yes.** Q Okay. So, again, I'll ask my question again. Is it your understanding that you need reasonable suspicion of some wrongdoing in order to conduct a field interview? **A Generally, yes. I mean, yeah, any time I – anytime I want to speak with somebody in a legalese sort of way, like, for example, at the airport and where I'm going to ID him, I would like – I'm going to have some reasonable suspicion.** |

(Dkt. #26 at ¶37.) In *United States v. Weathers*, 150 F.Supp.3d 1029, 1033 n. 5 (E.D. Wis., 2015), this Court concluded that testimony by officers that a field

interview was a stop based on reasonable suspicion: is a *Terry* stop. That is what we have here.

Defendants' reading of *Hall v. Bates*, 508 F.3d 854 (7th Cir. 2007), is wrong. In *Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010), the Seventh Circuit rejected defendants' argument and explained "whether a person asks permission to leave is but one factor among many in the arrest analysis." *Id.* at 833; see also *Warfield v. City of Chicago*, 679 F. Supp.2d 876, 892 (N.D. Ill., 2010) ("it was certainly reasonable for a jury to infer that any alleged failure to explicitly ask whether they were free to leave was because it was clear that they were not free to leave."); see *id.* ("deposition testimony that Plaintiffs said that they were ready to go"). Furthermore, Black testified that "I said my friend was waiting and I'd like to go, and they told me to wait." (Dkt. #25-1 at 29:11-13.) That is equivalent to asking whether Black was free to leave. Black also testified "they took everything so I couldn't really leave." (*Id.* at 29:2-5.) This court should find that Deputies Paull and Hartung "intended to and in fact did communicate to [Black] precisely what was going on—that he was a suspect in their investigation and was not free to leave before submitting to their questioning." *United States v. Smith*, 794 F.3d 681, 687 (7th Cir. 2015).

Courts have held that an officer seizes a citizen when the officer receives and retains identification. *United States v. Lopez*, 443 F.3d 1280 (10th Cir. 2006); *State v. Markland*, 112 P.3d 507 (Utah 2005). Deputy Hartung did that. Black's testimony is that he had the driver's license "for more than five minutes." (Dkt.

#25-1 at 29:17-19.)  In addition, Deputy Paull commanded Black to drop his bag. Moreover, we are talking about an encounter at an airport, not on the street; and Captain Witek's order was to "stay with Mr. Black until the sheriff leaves the baggage area" and "[s]o we stayed."  (Dkt. #25-6 at 18:1-8.)  In other words, the deputies detained Black.

Also consider *State v. Mitchell*, 265 Kan. 238, 960 P.2d 200 (Kan., 1998).  In that case, the Supreme Court of Kansas concluded "there is no doubt that the detention here violated Mitchell's Fourth Amendment rights to be free from unlawful seizures," even though Mitchell "was detained only a few minutes. . . ." *Id.* at 204.  In sum, the court should find that Sheriff Clarke caused Deputies Paull and Hartung to seize Black.

## 3.2  SHERIFF CLARKE CAUSED DEPUTIES PAULL AND HARTUNG TO STOP BLACK WITHOUT REASONABLE SUSPICION.

Although an illegal and ultimately fruitless *Terry* stop does not impose a major cost on officers, it "constitute[s] a 'serious intrusion'" for the individual stopped, and "may inflict great indignity and arouse strong resentment." *Dunaway* v. *New York*, 442 U.S. 200, 209 (1979) (quoting *Terry*, 392 U.S. at 20). "[R]easonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 498 (1983).  "The test for reasonable suspicion is an objective one." *United States v. Richardson*, 657 F.3d 521, 524 (7th Cir. 2011).  "Reasonable suspicion" thus means "'some objective manifestation that the person stopped is,

or is about to be, engaged in criminal activity.'" *United States v. Swift,* 220 F.3d 502, 506 (7th Cir. 2000) (quoting *United States v. Cortez,* 449 U.S. 411, 417 (1981)). Questioning that prolongs detention and is unjustified by the stop's purpose is unreasonable. *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002).

It is significant the brief exchange between these two men occurred during boarding in Dallas. Sheriff Clarke did not complain to any law enforcement in Dallas or the flight crew. Sheriff Clarke sat in first class; Black many rows behind. The flight was more than two hours. There was no other interaction between the men. Sheriff Clarke told Inspector Bailey that Black had not committed any offense—mind you the deputies in Milwaukee would have had no jurisdiction to stop Black regardless. Sheriff Clarke exited the airplane well before Black and was greeted by several deputies (including a police dog).

Sheriff Clarke has argued that he felt threatened. We point the court to *United States v. Broomfield*, 417 F.3d 654, 655 (Fed. 7th Cir. 2005), "Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you." Moreover, the actual evidence shows that Sheriff Clarke did not feel threatened. For example, Sheriff Clarke—a self-described bare-knuckle brawler—did not rise from his seat and confront Black. Nor did Sheriff Clarke contact law enforcement. Sheriff Clarke did not even alert the airline crew. And his order (a contemporaneous writing) was, "Question for him is why he said anything to me.

Why didn't he just keep his mouth shut?" (Dkt. #25-10.) At no point in time did Sheriff Clarke say that he feared Black.

Even if Sheriff Clarke did feel threatened, it was not objectively reasonable for him to feel that way. And it certainly was not objectively reasonable for him to feel that way more than two hours after the interaction.

Sheriff Clarke has also argued that he regularly receives threats. However, whether reasonable suspicion exists depends on what the facts show Black did, not what others may have done. It is also worth pointing out that many of the so-called threats are not threats at all. For example, Sheriff Clarke classified the following statement as a threat: "Stay out of Chicago you lousy UNCLE TOM!"

The court should find that the stop of Black by Deputies Paull and Hartung was without reasonable suspicion and was caused by Sheriff Clarke.

### 3.2.1 BLACK'S EXPRESSIVE SHAKE OF THE HEAD AT SHERIFF CLARKE IS PROTECTED UNDER THE FIRST AMENDMENT.

Sheriff Clarke acted contrary to the First Amendment by causing subordinates to stop Black for shaking his head. In *Sandul v. Larion*, 119 F3d 1250, 1255 (6th Cir. 1997), the Sixth Circuit held that a passenger yelling "fuck you" and extending middle finger while passing group of protestors was entitled to First Amendment protection. In *Duran v. Douglas*, 904 F.2d 1372, 1374, 1378 (9th Cir. 1990), the Ninth Circuit held that an "obscene gesture" and profanities directed to police, while "[i]narticulate and crude," "represented an expression of disapproval toward a police officer" that "fell squarely within the protective

umbrella of the First Amendment." In *York v. City of Las Cruces*, 523 F.3d 1205, 1212 (10th Cir. 2008), the Tenth Circuit held that calling a woman a bitch was protected. And in *Tobey v. Jones*, 706 F.3d 379, 388 (4th Cir. 2013), the Fourth Circuit held that bizarre behavior is protected under the First Amendment. Black's disdainful head shake is no worse than the above expressions.

### 3.2.2 SHERIFF CLARKE ACTED CONTRARY TO THE FIRST AMENDMENT BY CAUSING SUBORDINATES TO SEIZE BLACK.

It is obvious that Sheriff Clarke ordered Deputies Paull and Hartung to harass Black because of the head shake. (Dkt. #25-10.) To establish a *prima facie* § 1983 claim for First Amendment retaliation, Black must show that: "(1) he engaged in activity protected by the First Amendment, (2) he suffered an adverse action that would likely deter future First Amendment activity, and (3) the First Amendment activity was 'at least a motivating factor' in the defendants' decision to retaliate." *Santana v. Cook Cnty. Bd. of Review,* 679 F.3d 614, 622 (7th Cir.2012) (citations omitted). As explained above, Black's disdainful head shake is protected by the First Amendment. Next, Black was unlawfully stopped and threatened on social media. Finally, Sheriff's Clarke's own words connect the head shake to the constitutional deprivations. (Dkt. #25-10.)

### 3.2.3 SHERIFF CLARKE ACTED CONTRARY TO THE FIRST AMENDMENT BY HARASSING BLACK ONLINE AND ENCOURAGING OTHERS TO DO THE SAME.

Black's complaint to the county executive's office was also protected under the First Amendment. In *Holzemer v. City of Memphis*, 621 F.3d 512, 524 (6th

Cir., 2010), the Sixth Circuit held that a complaint to a city councilman was protected under the First Amendment. The Sixth Circuit also held that "our First Amendment retaliation cases demonstrate that the harassment necessary to rise to a level sufficient to deter an individual is not extreme." Accord *Massey v. Johnson*, 457 F.3d 711, 720 (7th Cir., 2006) (to give rise to liability, the retaliatory harassment need not be extreme."); see also *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) (holding that "campaign of petty harassments" that included ridicule could be enough to deter the exercise of free speech; *DeGuiseppe v. Vill. of Bellwood,* 68 F.3d 187, 192 (7th Cir. 1995) (noting that "a campaign of petty harassment" that includes "minor forms of retaliation" and "false accusations" may be actionable).

As explained above, Sheriff Clarke caused Deputies Paull and Hartung to seize Black. That is major intrusion. Sheriff Clarke also falsely accused Black of harassing him. (Dkt. #25-1 at 59:16-24.) The court should find that Sheriff Clarke unlawfully retaliated against Black for engaging in for complaining to the county executive's office.

## 3.3 SHERIFF CLARKE CAUSED DEPUTIES PAULL AND HARTUNG TO ARREST BLACK WITHOUT PROBABLE CAUSE.

The law provides that such a stop must be minimally intrusive, diligently pursued and reasonably related in scope to the circumstances which justified the initial interference. *United States v. Sharpe*, 470 U.S. 675, 682 (1985); see *id.* at 690 ("Even a stop that lasts no longer than necessary to complete the investigation

for which the stop was made may amount to an illegal arrest if the stop is more than 'minimally intrusive.'").  The stop in this case was more than minimally intrusive.  The deputies were not investigating criminal activity and they knew that when they stopped Black.  That Black was "warned" and "released" does not mean he was not arrested.  (Dkt. #25-9.)  Wis. Stat. § 968.08 ("A law enforcement officer having custody of a person arrested without a warrant may release the person arrested without requiring the person to appear before a judge if the law enforcement officer is satisfied that there are insufficient grounds for the issuance of a criminal complaint against the person arrested.").

The court should find that the stop of Black by Deputies Paull and Hartung amounts to an arrest without probable cause and was caused by Sheriff Clarke.

## 3.4 SHERIFF CLARKE DEPRIVED BLACK OF DUE PROCESS BY ENCOURAGE OTHERS TO CAUSE EMOTIONAL DISTRESS.

A citizen is deprived of due process when the state creates or increases a danger to an individual.  *See Sandage v. Bd. of Comm'rs,* 548 F.3d 595, 598–99 (7th Cir.2008) (stating "had it not been for the state's inaction in *DeShaney,* there would have been no injury"); *Paine v. Cason,* 678 F.3d 500, 510 (7th Cir.2012) ("Several decisions in this and other circuits hold that people propelled into danger by public employees have a good claim under the Constitution."). To "'create or increase' must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect" and thus circumvent

Case 2:17-cv-00156-JPS   Filed 10/11/17   Page 15 of 20   Document 25

*DeShaney's* general rule. *Sandage,* 548 F.3d at 599 (citation and emphasis omitted). "When courts speak of the state's 'increasing' the danger of private violence, they mean the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Id.* at 600. More recently, the Second Circuit found that where police officers "implicitly but affirmatively" encourage violence, such conduct could form a basis of a due process claim against the officers. *Okin v. Village of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 430 (2d Cir. 2009).

Sheriff Clarke actively encourage harassment that Black experienced online. In short, without Sheriff's Clarke's post there are no threatening messages to Black.

## 3.5   THE LAW WAS CLEARLY ESTABLISHED AT THE TIME OF SHERIFF CLARKE'S CONSTITUTIONAL VIOLATIONS.

Qualified immunity protects public officials from suit where their challenged actions were reasonable mistakes made while performing their jobs. *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). However, no immunity exists where: (1) his or her conduct violates a plaintiff's constitutional or statutory right; and (2) the right was clearly established at the time of the violation such that a "reasonable official would understand what he is doing violates that right." *Id.* (quoting *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000)) (internal quotation marks and additional citation omitted). For a right to be clearly established there does not have to be a prior case that is indistinguishable from

the current case; instead, what is required is that the officials were on notice that their conduct was a constitutional or statutory violation. *See Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006).

It is an undoubtedly natural consequence of telling Captain Witek to have subordinates question Black about "[w]hy he didn't just keep his mouth shut" and to "[f]ollow him to baggage and out the door" that Black's constitutional rights would be violated. This is especially true given that Deputies Hartung and Paull cannot remember receiving any reasonable suspicion training.

Furthermore, it is obvious that there was no objectively reasonable basis to stop Black at the time Sheriff Clarke gave the command. Sheriff Clarke ordered subordinates to seize Black more than two hours after Black shook his head.

## 3.6 MILWAUKEE COUNTY IS LIABLE FOR SHERIFF CLARKE'S UNLAWFUL CONDUCT.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), explained that the holding in *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), "makes clear that it expressly envisioned other officials 'whose acts or edicts may fairly be said to represent official policy,' and whose decisions therefore may give rise to municipal liability under § 1983." (citations omitted.) In *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 667 (7th Cir., 2009), the Seventh Circuit interpreted *Pembaur*, "It is well-established that when a particular course of action is directed by those who set municipal policy, the municipality is

responsible under section 1983, even if the action in question is undertaken only once"

This case is similar to *Pembaur*. In *Pembaur*, a county prosecutor ordered law enforcement officers to "go in and get" two witnesses who were believed to be inside the medical clinic of their employer. The officers had warrants for the witnesses, but, crucially, did not have a search warrant for the employer's business space. The officers nevertheless broke down the employer door and searched the business space pursuant to the prosecutor's direction. The Court held that the county could be held liable for prosecutor's conduct.

Similarly here, Sheriff Clarke ordered subordinates to seize Black without any legal basis. Sheriff Clarke also encouraged his followers to harass Black. Sheriff Clarke also failed to adequately train subordinates on reasonable suspicion. Under Wisconsin law, a county sheriff's department is an arm of the county. See *Abraham v. Piechowski*, 13 F. Supp. 2d 870, 877-879 (E.D. Wis. 1998). Sheriff Clarke is indisputably the final policymaker for the county in the area of law enforcement at the airport. (Dkt. #26 at ¶38.) The county is therefore liable for Sheriff Clarke's wrongful conduct under *Pembaur*.

Furthermore, it is obvious that without adequate training on reasonable suspicion, deputies will violate the civil and constitutional rights of the citizens they stop. *City of Canton v. Harris*, 489 U.S. 378, 389-90 (1989) (plaintiffs may demonstrate that official policy "evidences a 'deliberate indifference'" to constitutional rights by showing that it "is so obvious, and the inadequacy [of the

current procedure] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need."). It is also obvious that if the deputies cannot remember the training they received it is not frequent enough to be effective. Sheriff Clarke is responsible for making sure that his subordinates are properly trained on reasonable suspicion. He has failed.

## 4. CONCLUSION

Sheriff Clarke willfully disregarded Black's civil and constitutional rights because Sheriff Clarke was upset. Defendants' motion should be denied in its entirety.

For all of the above reasons, the court should enter an order granting Black's motion for partial summary judgment.

Dated at the law offices of Peterson, Johnson & Murray, S.C., in Milwaukee, Wisconsin, on this 11th day of October, 2017.

PETERSON, JOHNSON & MURRAY, S.C.
Attorneys for Plaintiff Daniel Black


*/s/ William F. Sulton, Esq.*
William F. Sulton, Esq.
State Bar No. 1070600
788 N Jefferson St Ste 500
Milwaukee, WI 53202
Phone: 414-278-8800
Fax: 414-278-0920
Email: wsulton@pjmlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Wisconsin by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

PETERSON, JOHNSON & MURRAY, S.C.
Attorneys for Plaintiff Daniel Black

*/s/ William F. Sulton, Esq.*
William F. Sulton, Esq.
State Bar No. 1070600
788 N Jefferson St Ste 500
Milwaukee, WI 53202
Phone: 414-278-8800
Fax: 414-278-0920
Email: wsulton@pjmlaw.com