# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DANIEL BLACK,

                Plaintiff,

v.

DAVID CLARKE, COUNTY OF
MILWAUKEE, WISCONSIN, and
JOHN DOES ONE-SIX,

                Defendants.

Case No. 17-CV-156-JPS

**ORDER**

## 1.  INTRODUCTION

This action arises from an encounter on an airplane between former Milwaukee County Sheriff David Clarke ("Clarke") and the plaintiff, Daniel Black ("Black"), which led to airport questioning and a social media spat. Black accuses Clarke of First, Fourth, and Fourteenth Amendment violations, and seeks to hold both him and Milwaukee County liable.

On September 11, 2017, the defendants filed a motion for summary judgment. (Docket #15). Black responded on October 11, 2017, (Docket #25), and the defendants replied on October 25, 2017 (Docket #29). For the reasons explained below, the defendants' motion will be granted in part and denied in part. The surviving claim will proceed to a jury trial.

## 2.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir.

2016).  A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

## 3.    FACTUAL BACKGROUND

### 3.1    Plaintiff's Failure to Dispute Defendants' Proposed Facts

Many of the relevant facts are undisputed because Black failed to dispute them. Federal Rule of Civil Procedure 56 and Civil Local Rule 56 describe in detail the form and contents of a proper summary judgment submission. In connection with their motion for summary judgment, the defendants filed a supporting statement of material facts that complied with the applicable procedural rules. (Docket #17). It contained short, numbered paragraphs concisely stating those facts they proposed to be beyond dispute, with supporting citations to the attached evidentiary materials. *See id.*

As the party opposing the defendants' motion, Black was required to file "a concise response to the moving party's statement of facts" containing "a reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph, including, in the case of any disagreement, specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon[.]" Civ. L. R. 56(b)(2)(B). Black did no such thing. He filed

only a memorandum of law opposing summary judgment, his own proposed facts, and a declaration attaching evidentiary material. (Docket #25-28). The effect of this failure is that, for the purpose of deciding summary judgment, the defendants' uncontroverted statements of material fact are deemed admitted. Civ. L. R. 56(b)(4); *see also Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 607–08 (7th Cir. 2008) ("[A] district court is entitled to demand strict compliance with [the local] rules for responding to a motion for summary judgment, and . . . a court does not abuse its discretion when it opts to disregard facts presented in a manner inconsistent with the rules.") (citation omitted).

The Court will consider Black's proposed facts, (Docket #28-12), only to the extent they do not contradict the defendants' uncontroverted proposed facts, (Docket #17).[1]

### 3.2    Relevant Facts

On January 15, 2017, Clarke boarded a plane bound for Milwaukee, Wisconsin from the Dallas / Forth Worth International Airport. He took his seat toward the front of the plane. Black boarded the plane after Clarke, and, during the boarding process, stopped in the aisle immediately adjacent to Clarke's seat. Black asked Clarke if he was the Milwaukee Sheriff, and Clarke responded affirmatively. Then, in what Clarke believed was a physically threatening manner, Black stared at Clarke and shook his head. As Black started to walk toward his seat,

---

[1]Black filed amended proposed facts, an amended declaration, and accompanying exhibits a day after his deadline to respond to the defendants' summary judgment motion. He moved the Court to excuse the late filing and accept his submissions, stating that technical problems prevented him from completing a timely filing. (Docket #28). The defendants did not oppose Black's request. The Court will grant Black's motion and accept his submissions.

Clarke asked Black if he had a problem, and Black responded by turning, shaking his head, and waving Clarke off in a manner indicating displeasure. The men did not have further interaction during the flight.

Before the plane took off, Clarke used his cell phone to call Inspector Edward Bailey ("Bailey"), who was then employed by the Milwaukee County Sheriff's Office and whose regular duties included meeting Clarke at the Milwaukee airport when Clarke arrived home from an out-of-state trip. Clarke informed Bailey of the confrontation with Black, saying "it had happened again" and that he had had a "confrontation with a passenger on an aircraft." (Docket #17 at 4).[2] Clarke described Black to Bailey and told Bailey that the confrontation had not been physical. Clarke did not think that it amounted to an offense for which a citation or arrest was appropriate. Clarke nevertheless told Bailey that he wanted deputies to conduct a "field interview" of Black when the plane arrived in Milwaukee. According to Clarke's undisputed version of the facts, a "field interview" in the Sheriff's parlance is a "voluntary police-citizen encounter in which an officer obtains information from a citizen and makes an identification of the citizen." (Docket #17 at 4).[3]

---

[2]Clarke states that he had several unprovoked confrontations with members of the public at airports or on airplanes during his tenure as Milwaukee County Sheriff. (Docket #18 at 1).

[3]Black states in his proposed facts that "[t]he term 'field interview' means a stop based on reasonable suspicion." (Docket #27 at 5). This is inconsistent with the defendants' proposed facts and, as noted earlier, Black's failure to properly dispute the defendants' proposed facts constrains this Court to accept the defendants' account. Further, even if Black had properly disputed this fact, it would not change the Court's analysis, as Fourth Amendment claims are governed by an objective standard. *See Whren v. United States,* 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth

Bailey immediately called Captain Mark Witek ("Witek"), commander of the Airport Division of the Milwaukee County Sherriff's Office, to relay the information he had just received from Clarke. Separately, Clarke sent a text message to Witek instructing him to have deputies conduct a field interview of Black after the plane landed. Before the plane arrived in Milwaukee, Witek told Deputies Steven Paull ("Paull") and Jeffrey Hartung ("Hartung") that there was an individual on Clarke's flight that had possibly harassed him, and that the deputies were to conduct a field interview of that individual to identify him and obtain basic information.

After the plane landed, Clarke exited the plane, entered the concourse at Gate D54, and walked up to several waiting Milwaukee County Sheriff's Office personnel. Witek, Sergeant James Sajdowitz ("Sajdowitz"), Deputy Karen Mills ("Mills"), and Mills' canine were there to greet Clarke as part of standard procedure for the sheriff's airport arrival. Paull and Hartung were there solely for the field interview. Clarke stayed in the gate area with the other Sheriff's Office personnel until Black exited the plane and entered the concourse. Clarke identified Black to Witek, Paull, and Hartung and then left the gate area with Witek, Sajdowitz, and Mills.

Paull and Hartung approached Black and said they needed to speak with him about an incident with Clarke on the plane. A brief segment of security footage from the gate area shows that the deputies did not use physical force when confronting Black. (Docket #22-10). They walked with him to an open area at the center of Concourse D, near an

_____

Amendment analysis."); *Tebbens v. Mushol*, 692 F.3d 807, 816 (7th Cir. 2012) (subjective intent of officers is irrelevant to inquiry into the nature of detention).

unoccupied commercial space, that was not as confined and crowded as the gate area.[4] As they walked, Paull was several feet to Black's left and Hartung was behind Paull. When they arrived in the open area of the concourse, the deputies told Black to set down his bag and provide proof of his identity, which he did. Hartung called dispatch to run a check of Black's name and information from his Illinois driver's license for any outstanding warrants.

While they waited on dispatch, Paull asked Black to describe what happened with Clarke on the plane. Black relayed his account, and Paull, skeptical that Black's account was complete, asked Black if he had done anything else toward Clarke. Black called the situation ridiculous and Paull agreed. Paull asked Black what he thought of Clarke and Black responded, "[n]o comment." (Docket #17 at 8). Paull and Black then discussed other topics, apparently in a friendly manner. The three men learned that they all had attended the University of Wisconsin—Milwaukee for college, and both Black and Hartung had played rugby there. When the field interview concluded (presumably the warrant check came back negative), the deputies escorted Black through the airport and outside to a waiting car driven by Black's friend. The field interview lasted approximately fifteen minutes.[5]

---

[4]Black describes the area differently, stating in his proposed facts that it was "not open to the public." (Docket #30 at 4). The defendants' undisputed version of this fact will be accepted. In any event, Black's deposition testimony makes clear that the area to which he was taken for questioning was closed to the public only in the sense that it was beyond the security checkpoint through which travelers pass to access the airports' gates. *See* (Docket #22-1 at 7).

[5]The parties bicker about whether the deputies' questioning lasted 15 minutes (in the defendants' view) or 25 minutes (in Black's view). The plane carrying Clarke and Black landed at 2:32 p.m., *see* (Docket #22-3) and the

At no point in the interview did the deputies tell Black he was not free to leave, nor did Black ask if he was free to leave.[6] Black used his cell phone during the encounter to communicate with the friend who was picking him up at the airport. Black also filmed video as the deputies escorted him out of the airport, and the deputies did not stop him from doing so. At his deposition, Black described the deputies who questioned him as "kind." (Docket #22-1 at 2). Black acknowledged that he did not refuse to answer the deputies' questions and said he was "trying to be helpful." (Docket #22-1 at 8). He also testified that he felt as though he could not leave without answering the deputies' questions. *Id.*

 Shortly after leaving the airport, Black posted about his interaction with Clarke and the deputies on a public Facebook group page. (Docket #22-1 at 13). His post read:

> Just got off a flight from Dallas. Our wonderful Sheriff Clarke was on the flight. I couldn't tell if it was him because he was all decked out in all Cowboys gear, so I asked. When he responded yes, I shook my head at him and moved on. From behind me he asked if I had a problem and I shook my head no again. When we landed at Mitchell International, I had a welcoming party of about six cops and drug/bomb dogs, who questioned me for about 15 minutes before

---

deputies escorted Black out of the airport nineteen minutes later, at 2:51 p.m., *see* (Docket #22-1 at 10). The defendants' estimate is not properly disputed and also more accurate; it will be accepted.

[6]Black offers contradictory testimony, stating that he did ask to leave and was told to wait. (Docket #28-12 at 4). But his failure to dispute the defendants' facts leaves those facts undisputed. Further, the Court's acceptance of the defendants' version is bolstered by Hartung's deposition testimony. He indicated that when the deputies perceived Black was anxious to meet his awaiting ride, they did not make him wait any longer, and escorted him out of the airport. *See* (Docket #22-9 at 6).

escorting me out. Just posting to let y'all know be careful around our Sheriff, he needs to be in a safe space at all times.

(Docket #22-1 at 13).

A couple days after the airport incident, Black filed a formal complaint about Clarke with Milwaukee County. (Docket #22-1 at 12). A day or two after that, on January 18, 2017, the Milwaukee County Sherriff's Office Facebook account posted a link to Black's complaint and a comment attributed to Clarke: "Next time [Black] or anyone else pulls this stunt on a plane they may get knocked out. The Sheriff . . . does not have to wait for some goof to assault him. He reserves the reasonable right to pre-empt a possible assault." *See* (Docket #22-1 at 15).[7] The next day, Clarke posted on the same Facebook account a meme, reproduced below, that included a picture of Black and the text "Cheer up, snowflake . . . if Sheriff Clarke were to really harass you, you wouldn't be around to whine about it." (Docket #22-1 at 15 and #30 at 10).[8]

---

[7]Black did not include copies of the relevant Facebook posts as evidence in opposition to the defendants' summary judgment motion. The Court therefore relies on reproductions in the complaint, Black's deposition testimony describing the posts, and the posts themselves, which still appear on Facebook. *See* Milwaukee County Sheriff's Office, Facebook (Jan. 18, 2017), *https://www.facebook.com/MilwaukeeCountySheriff/posts/10154659733950189*; Milwaukee County Sheriff's Office, Facebook (Jan. 19, 2017), *https://www.facebook.com/MilwaukeeCountySheriff/posts/10154663044105189:0*.

[8]Although the January 19, 2017 post is not directly attributable to Clarke on its face, the defendants do not contest that it was Clarke who made it. (Docket #30 at 9-10).



CHEER UP, SNOWFLAKE...

IF SHERIFF CLARKE WERE TO REALLY HARASS YOU, YOU WOULDN'T BE AROUND TO WHINE ABOUT IT.

Black testified that he interpreted Clarke's posts as threats, and that they caused him mental and emotional harm. (Docket #22-1 at 17). Black also testified that because of Clarke's posts, he has become the target of threatening and anti-Semitic comments online. *Id.*

4.    **ANALYSIS**

Black brings claims against Clarke under the First, Fourth, and Fourteenth Amendments.[9] Black also brings a *Monell* claim against

---

[9]The defendants ask the Court to disregard Black's First and Fourteenth Amendment claims because Black first asserted them in response to their motion for summary judgment, and that, they argue, is too late in the day. The defendants are right that a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012). On the other hand, a plaintiff has latitude to refine and develop his legal theories based on the record that emerges in discovery. *See CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729, 743 (7th Cir. 2015). This latitude is in keeping with Rule 8(a)'s notice pleading regime, under which "[a] complaint need not identify legal theories." *Id.* at 744; *see also Currie v. Chhabra*, 728 F.3d 626, 629 (7th Cir. 2013) ("It therefore does not matter whether the complaint mentioned the Fourth Amendment, the Fourteenth

Milwaukee County based on Clarke's alleged constitutional violations. The defendants respond by contesting each of the alleged constitutional violations and arguing that, even if the Court finds a violation, Clarke is entitled to qualified immunity.

The Court's analysis begins with Black's Fourth Amendment claim, as the facts underlying that claim begin the story of this case. The Court then turns to Black's First and Fourteenth Amendment claims, and finally to Black's *Monell* claim against Milwaukee County. Clarke's entreaty for qualified immunity as to Black's constitutional claims is addressed only where the Court finds a potential constitutional violation.

### 4.1 Fourth Amendment

Black contends that Clarke violated his Fourth Amendment right to be free from unreasonable seizures, *see United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000), when Clarke directed deputies to confront him in the airport and conduct an interview. To state a cause of action under the Fourth Amendment, the defendant's conduct must constitute a seizure and that seizure must have been unreasonable in light of the circumstances. *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1010 (7th Cir. 2000). Defendants argue that: 1) Black was not seized within the meaning of the

---

Amendment, or neither, so long as it provided adequate notice of the plaintiff's claim to the defendants."). A plaintiff opposing summary judgment may not inject "new and drastic factual allegations," but instead must adhere to the complaint's "fundamental factual allegation[s]." *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014). Although Black's complaint does not include reference to the First or Fourteenth Amendments, it does include the factual allegations on which those claims are based, namely Clarke's social media response to Black's protected speech acts. *See* (Docket #1 at 6-7, 10-11). The defendants were on sufficient notice to defend against Black's First and Fourteenth Amendment claims as presented in his summary judgment submission.

Fourth Amendment; 2) even if he was, Clarke did not direct the seizure; and 3) the seizure was reasonable in any event. Determining whether Black was seized at all is sufficient to dispose of the claim.

Stated in general terms, a seizure occurs when a person's "freedom of movement" is restrained either by "physical force" or a "show of authority." *United States v. Mendenhall,* 446 U.S. 544, 553 (1980). Not all encounters between law enforcement and citizens constitute seizures. Police-citizen encounters generally fall into one of three categories, only the first two of which constitute seizures: (1) an arrest, requiring probable cause; (2) an investigatory stop, limited to "a brief, non-intrusive detention" based on specific and articulable facts supporting reasonable suspicion of criminal activity; and (3) voluntary encounters involving no restraint on the citizen's liberty. *United States v. Scheets,* 188 F.3d 829, 836 (7th Cir. 1999). A seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall,* 446 U.S. at 554.

Because this question is context-dependent, courts have developed various factors to determine whether a seizure has occurred. For example, circumstances indicative of a seizure include

> the threatening presence of several officers, display of their weapons, physical touching of the private citizen, use of forceful language or tone of voice (indicating that compliance with the officers' request might be compelled), and the location in which the encounter takes place. Courts also consider whether police made statements to the citizen intimating that he or she was a suspect of a crime, whether the citizen's freedom of movement was intruded upon in some way, whether the encounter occurred in a public or private place, and whether the officers informed the suspect

that he or she was free to leave. These factors, however, are neither exhaustive nor exclusive.

*United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015) (internal quotations and marks omitted).

Under the totality of the circumstances, the deputies' interview of Black, at Clarke's request, did not amount to a seizure. First, it is undisputed that Clarke instructed Bailey and Witek to have deputies conduct an interview of Black, and that Black had not done anything that would rise to the level of a citation or arrest. Clarke did not instruct his deputies to arrest or detain Black.

Although several officers were present at the gate when Black deplaned, only two approached him for questioning. There is no allegation and no evidence in the record that the deputies displayed their weapons. There is also no allegation or evidence that the deputies were forceful with Black, confirmed by the short amount of video surveillance capturing the deputies' initial contact with Black showing no use of force. Nor did the deputies use forceful language; in fact, Black testified that the deputies who interviewed him were "kind."

Next, the deputies' questions were of a fact-gathering, as opposed to accusatory, nature. The deputies did not intimate to Black that he was a suspect of a crime. The limited information that Clarke conveyed to Witek, who presumably conveyed the same to the deputies, was that Black had had an interaction with Clarke on the plane that Clarke perceived as threatening. The deputies collected Black's biographical information, as well as his side of the story, before agreeing that the whole incident was "ridiculous" and escorting Black out of the airport to an awaiting car.

Finally, the encounter was relatively brief and occurred in an area of the airport that was open to the public.

True enough, the deputies did not tell Black he was free to leave, but Black also did not ask to leave. Black contends that it was "obvious" he wanted to leave the airport without staying to answer the deputies' questions, but that he could not leave because the deputies had instructed him to set down his bag and the deputies had his driver's license in hand. (Docket #28-12 at 3-4). The defendants counter that Black answered the deputies' questions voluntarily, and Black admits he sought to be helpful to the deputies. "[W]hether a person asks permission to leave is but one factor among many in the arrest analysis," *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010), and in this case, the dispute about permission to leave is overshadowed by the other circumstances of the encounter, described above, which demonstrate that Black was not seized. *See Scheets*, 188 F.3d at 837 (no seizure occurred when subject agreed to accompany a federal agent and private security officer to casino security office, and subject was free to leave through an unlocked door next to his chair).

Because Black was not seized within the meaning of the Fourth Amendment, the defendants are entitled to summary judgment on that claim. *Brokaw*, 235 F.3d at 1010.

### 4.2    First Amendment Retaliation

Black complains of two First Amendment violations. First, he alleges that in response to his expressive conduct on the plane (shaking his head in displeasure), Clarke retaliated against him by sending his deputies to question him. Second, he alleges that in response to his filing a complaint with Milwaukee County, Clarke retaliated against him by making threatening and harassing public posts about him on social media.

To prevail on a First Amendment retaliation claim, the plaintiff must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendant's decision to take the retaliatory action." *Bridges*, 557 F.3d at 546 (citations and internal marks omitted).

As to the second factor, retaliatory speech is generally actionable "only in situations of threat, coercion, or intimidation that punishment, sanction, or adverse regulatory action will immediately follow." *Novoselsky v. Brown*, 822 F.3d 342, 356 (7th Cir. 2016) (quotation and internal marks omitted). A common fact pattern for retaliation cases is in the employment context, where an employer threatens to terminate, or actually terminates, an employee in retaliation for the employee's protected (but unpopular) speech. *See, e.g., Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009) (municipal employee stated First Amendment claim against mayor, municipal administrator who terminated her, and municipality claiming she was fired in retaliation for speaking out against their practices of nepotism and ghost payrolling).

In fewer cases, possibly because the practice happens less frequently, the Seventh Circuit has found actionable retaliation where the defendant public official threatens physical harm. In *Fairley v. Andrews*, for example, correctional officers harassed two fellow officers to prevent them from testifying in a civil rights case brought by several inmates. 578 F.3d 518, 520 (7th Cir. 2009). The defendant officers taunted and physically assaulted the plaintiff officers, and when one of the plaintiff officers was

attacked by an inmate with a shank, a defendant officer remarked: "[y]ou see that, Fairley? You fuck with people, that's how you get stabbed." *Id.*

A public official may also face liability for retaliatory speech that is not threatening, but is humiliating or harassing. "But this is a high bar, usually limited to the release of highly personal and extremely humiliating details to the public." *Novoselsky*, 822 F.3d at 356 (quotation omitted). The Seventh Circuit has pointed to *Bloch v. Ribar*, a Sixth Circuit case, as an example. *Id.* (citing *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998)). In that case, a sheriff responded to a rape victim's criticism of his investigation of her rape by revealing to the media intimate, humiliating, and undisclosed details about the rape. *Bloch,* 156 F.3d at 679–80. The court found that the victim stated a claim against the sheriff for First Amendment retaliation. *Id.*

Finally, a public official can be held liable for First Amendment retaliation by subjecting the speaker to a "campaign of petty harassment." *See, e.g., Bart v. Telford,* 677 F.2d 622, 624 (7th Cir. 1982). In *Bart,* the Court of Appeals found a cognizable First Amendment retaliation claim in the employment context based on the defendants' concerted, prolonged campaign of harassment. *Id.* This included such things as baseless reprimands and ridicule for bringing a birthday cake to the office on the occasion of the birthday of another employee although the practice was common. *Id.* Although the harassment allegations carried "a certain air of the ridiculous," the court held that they presented a question of fact as to "whether the campaign reached the threshold of actionability under section 1983." *Id.* at 625.

Similarly, in *Wallace v. Benware*, the Court of Appeals affirmed a jury's finding that the defendant county sheriff violated the First

Amendment by engaging in a campaign of retaliatory harassment directed at the plaintiff deputy who had announced that he would run against the sheriff in an upcoming election. 67 F.3d 655, 662 (7th Cir. 1995). The harassment included taking away the deputy's portable radio and radar unit, ordering the deputy (but no one else) to leave his squad car at the station on weekends, inhibiting the deputy's ability to fulfill his responsibilities in the department's D.A.R.E. program, giving the deputy a series of atypical cleaning assignments, and, in the most serious instance, putting the deputy in harm's way during an armed robbery by ordering him to leave the scene from a concealed position for no sensible reason. *Id.* at 656-58; *see also Bridges*, 557 F.3d at 551-52 (prisoner sufficiently pled retaliation by alleging that, after he filed an affidavit in the wrongful death action of a deceased inmate's mother, he experienced delays in his incoming and outgoing mail, harassment by a guard kicking his cell door, turning his cell light off and on, and opening his cell trap and slamming it shut in order to startle him, unjustified disciplinary charges, and improper dismissal of his grievances).

In contrast, an isolated instance of public ridicule will not amount to actionable retaliatory harassment unless it is egregious enough to deter a person of ordinary firmness from exercising his right of free speech. For example, the same defendant in this case skirted a claim of retaliatory harassment in *Hutchins v. Clarke*, where the Seventh Circuit found that Clarke's statements on a radio show about a deputy who had criticized Clarke did not amount to First Amendment retaliation. 661 F.3d 947, 956–57 (7th Cir. 2011). In that case, Clarke called into a radio show to respond to the deputy's on-air criticism by calling the deputy "a 'slacker' who did not deserve to be an employee of the sheriff's department," and

"express[ing] the view that [the deputy] was bitter and carried a grudge against him because of a disciplinary action" that Clarke had taken against the deputy. *Id.* at 950. Clarke identified the disciplinary action on-air "as a step taken as a result of [the deputy's] 'sexual harassment' of another employee. In actuality, the disciplinary action was for [the deputy's] violation of a department rule that prohibited offensive conduct or language toward the public or toward county officers or employees." *Id.*

The Court of Appeals found that Clarke's statements did not threaten punishment, and that "[e]ven if some 'harassment and ridicule' might be retaliatory speech under § 1983, Sheriff Clark[e]'s statements did not rise to that level." *Id.* at 956-57 (quotation omitted). After all, the Court must take into account the defendant speaker's own right to free speech. *Id.* at 956; *see also Novoselsky*, 822 F.3d at 356 ("Unconstitutional retaliation by a public official requires more than criticism or even condemnation.").

Having surveyed the landscape of applicable First Amendment jurisprudence, the Court turns now to the two incidents of alleged retaliation in this case.

### 4.2.1   The airport encounter

Black first alleges that Clarke retaliated against him by directing his deputies to stop and interview him at the airport in response to Black having stared and shaken his head in displeasure at Clarke on the plane. The defendants do not contest that Black's expressive gesture on the plane was protected speech or that Clarke's directive for the interview was motivated by that speech. *See* (Docket #29 at 12). The only question, then, is whether the retaliatory action would "deter a person of ordinary firmness" from exercising his First Amendment rights in the future. *Bridges*, 557 F.3d at 552.

As discussed above, Black voluntarily submitted to an interview with deputies at the airport. He was not "deprived" of anything, or made to do something he did not agree to do. Black cites no authority for the proposition that being asked to submit to voluntary questioning by police, in response to a protected speech act, would deter a person from exercising his speech rights in the future.

The analysis might be different if Black had been issued a citation and/or fined for his on-board glare. *See, e.g., Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 348 (2010) ("If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech."). Different, too, if Black had been arrested. *See, e.g., Thayer v. Chiczewski,* 705 F.3d 237, 252-53 (7th Cir. 2012) (recognizing that an arrest is a deprivation for purposes of a First Amendment retaliatory claim, but noting that the case law is unsettled as to whether the existence of probable cause would be a complete bar to such a claim). On the facts presented, however, Black has not shown that being stopped for fifteen minutes in order to voluntarily respond to deputies' questions would likely deter First Amendment activity in the future. The defendants' motion for summary judgment must be granted on this claim.

### 4.2.2    The Facebook posts

Black next alleges that Clarke retaliated against him by making mocking and, in his view, threatening, posts on Facebook in response to the airplane snub and the formal complaint Black submitted to Milwaukee County. Recall that Clarke's first post said that "[n]ext time [Black] or anyone else pulls this stunt on a plane they may get knocked out," *see* (Docket #22-1 at 15), and his second said that "if Sheriff Clarke were to

really harass you, you wouldn't be around to whine about it," (Docket #22-1 at 15 and #30 at 10). Black claims to understand these post as threats meant to deter him or others from criticizing Clarke.

Again here, the defendants do not contest that Black engaged in protected speech or that Clarke's posts were motivated thereby. *See* (Docket #29 at 12). The only question, then, is whether Clarke's Facebook posts would deter a person of ordinary firmness from exercising his First Amendment rights.

The defendants are right that Clarke's posts do not amount to a "campaign" of harassment like what was described in *Bart* and *Wallace*, where the defendants repeatedly tormented the plaintiffs with petty reprimands and ridicule. And Clarke's posts are not profoundly humiliating to Black in the way that the sheriff's public statements were to the plaintiff rape victim in *Bloch.*

But Clarke's posts could reasonably be understood as a "threat, coercion, or intimidation that punishment . . . will immediately follow." *Novoselsky*, 822 F.3d at 356. They say as much on their face, and in aggressive and combative language. *Cf. Fairley,* 578 F.3d at 520 (defendant's comment implying plaintiff officers deserved to be stabbed was sufficiently threatening to state a claim). Of course, another interpretation is that the posts are intentionally hyperbolic (and juvenile) attempts at mockery and self-promotion, and that an ordinary person would not be intimidated by them.

In this Circuit, "retaliation need not be monstrous to be actionable under the First Amendment[.]" *DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995). Whether retaliatory conduct is sufficiently severe as to be actionable is a question of fact, *Wallace,* 67 F.3d at 664, n.9, unless it is so

trivial that it would not deter a person of ordinary firmness from the exercise of the right. *Bart,* 677 F.2d at 625. On the record before the Court, taking all facts in a light most favorable to Black, the Court cannot say Clarke's posts were so trivial that no jury could find them to be sufficiently threatening to deter future speech. The defendants' motion for summary judgement as to this claim must be denied.

### 4.2.3  Qualified Immunity

At this juncture, having determined that triable issues of fact preclude summary judgment on Black's First Amendment claim, the Court would ordinarily turn to the issue of qualified immunity. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

However, Clarke has not argued for qualified immunity as to Black's First Amendment claim based on the Facebook posts; he argues for qualified immunity only as to Black's Fourth Amendment claim. (Docket #16 at 10-13 and #29 at 13-15). For example, in his opening brief, Clarke argues that "[i]ndeed, there is and was on January 15, 2017, no clearly established right on the part of an individual to avoid non-coercive questioning and identification by law enforcement after interacting with a public official who has a high-risk security profile." (Docket #16 at 12). He repeats, nearly verbatim, the same argument in his reply brief. (Docket #29 at 13). Nowhere in his entreaty for qualified immunity does Clarke even mention the Facebook posts, let alone argue that he is entitled to protection for liability for a First Amendment claim based on those posts.

It is not the Court's job to present arguments on a party's behalf. *Luddington v. Ind. Bell Tel. Co.*, 966 F.2d 225, 230 (7th Cir. 1992) ("If we assume lawyers' responsibilities, we unbalance the market for legal services and take time away from our consideration and decision of other cases."). The Court will not consider whether Clarke would be entitled to qualified immunity for Black's surviving First Amendment claim.

### 4.3    Fourteenth Amendment

Black's final claim against Clarke arises under the Due Process Clause of the Fourteenth Amendment. Due process generally confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). "Under the state-created danger doctrine, however, a substantive due process claim can proceed where the state 'affirmatively places a particular individual in a position of danger the individual would not otherwise have faced.'" *Wilson-Trattner v. Campbell*, 863 F.3d 589, 593 (7th Cir. 2017) (quoting *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015)).

To prevail on a due process claim under the state-created danger theory, Black must show that "(1) the state by its affirmative acts created or increased a danger to [him], (2) the state's failure to protect [him] from danger was the proximate cause of [his] injury and (3) the state's failure to protect [him] shocks the conscience." *Id.* (citation omitted).

"The 'shocks the conscience' prong is an attempt to quantify the rare 'most egregious official conduct' required for substantive due process liability." *Flint v. City of Belvidere*, 791 F.3d 764, 770 (7th Cir. 2015) (quoting *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654–55 (7th Cir. 2011)).

A public official "must act with a *mens rea* akin to criminal recklessness for constitutional liability to attach[.]" *Flint*, 791 F.3d at 770.

Conscience-shocking conduct includes, for example, officers arresting a sober driver and leaving behind an obviously drunk passenger with the keys to the vehicle who later caused a collision, injuring the plaintiffs. *Reed v. Gardner,* 986 F.2d 1122, 1127 (7th Cir. 1993). So, too, when officers arrested a woman in a safe place and released her in a hazardous one while she was unable to protect herself. *Paine v. Cason*, 678 F.3d 500, 511 (7th Cir. 2012). In each of these cases, the plaintiff was safe (or safer) until the police stepped in.

Black claims that Clarke placed him in a position of danger by "actively encourag[ing] harassment that Black experienced online" because "without Sheriff Clarke's post there are no threatening messages to Black." (Docket #25 at 16). This is the only sentence in Black's brief explaining why he believes Clarke's conduct is actionable under this theory. *Id.* The Court would be well within bounds to treat this claim as underdeveloped, and thus waived. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (arguments that are "underdeveloped, conclusory, or unsupported by law" are waived). Nevertheless, because it is also completely without merit, the claim will be dismissed for that reason.

First, Black has not persuaded the Court that the "danger" he faces from online harassment by third-parties is the kind of danger meant to be addressed by the state-created danger rule. Even if it were, Black has not even alleged, much less proven with evidence, that Clarke knew or should have known that Black would face the "danger" of online harassment from third-parties after he made his Facebook posts. While Clarke's actions reflect poor judgment, they do not shock the conscience. To the

extent Black wishes Clarke or other officers would stop online bullies from harassing him, the Fourteenth Amendment does not require the state to step in to prevent private violence, much less private name-calling. *DeShaney*, 489 U.S. at 196-97 (1989); *Vill. of Arlington Heights*, 782 F.3d at 918. Black's Fourteenth Amendment claim must be dismissed.

### 4.4 *Monell*

Finally, Black seeks to hold Milwaukee County liable for Clarke's constitutional violations under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). The Supreme Court held in *Monell* that although local government entities cannot be held vicariously liable for constitutional violations committed by their employees, they can be held liable under Section 1983 if "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690).

The only surviving constitutional claim for which Milwaukee County could possibly be liable is Black's First Amendment retaliation claim based on Clarke's Facebook posts. Black has barely argued for application of *Monell* to that claim. He primarily argues that Milwaukee County should be held liable for a Fourth Amendment violation based on the airport encounter, *see* (Docket #25 at 17-19), but the Court has already determined there was no Fourth Amendment violation. *See Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)) ("If the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants,

there will be no viable *Monell* claim based on the same allegations."); *see also Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010) ("[A] municipality cannot be liable under *Monell* [for failure to train] where there is no underlying constitutional violation by a municipal employee.").

Black's underdeveloped argument for *Monell* liability as to the First Amendment claim is that Clarke is a final policymaker for Milwaukee County and he "encouraged his followers to harass Black." (Docket #25 at 18). Black's complaint sheds little additional light on his theory, adding that "[i]t is the policy and practice of Sheriff Clarke's office and Milwaukee County to intimidate and dissuade citizens from complaining about misconduct by Sheriff Clarke and his deputies" and "to threaten citizens that complain about misconduct by Sheriff Clarke or his deputies." (Docket #1 at 10-11).

First, Black has not introduced any evidence whatsoever that Clarke's social media conduct was undertaken pursuant to a policy or practice of Milwaukee County or its Sheriff's Office. The allegations here relate to isolated actions in one case, not a policy or practice.

Next, "whether a particular official has 'final policymaking authority' is a question of state law," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988), and Black has not pointed to Wisconsin law indicating that Clarke has final policymaking authority in the area of responding to complaints from citizens (or using the Sheriff's Office social media accounts). Black only argues that Clarke is a final policymaker in the area of law enforcement at the airport. (Docket #25 at 18).

The Court will not make Black's case for him. "Summary judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.*, 612

F.3d 932, 937 (7th Cir. 2010) (quotation omitted). Black has not put up any evidence connecting Milwaukee County to Clarke's potential First Amendment violation in this case, and therefore summary judgment must be granted in the defendants' favor as to Black's *Monell* claim.

### 4.5    Doe defendants

Finally, the Court will dismiss the six John Doe defendants who Black named in his complaint but who have not been further identified in this case. The complaint alleges that Does One and Two are the deputies who questioned Black at the airport, and Does Three through Six are the other deputies present at the gate when the plane carrying Black and Clarke arrived in Milwaukee. (Docket #1 at 5). Black learned the identities of these deputies in discovery and addressed them by name in his brief opposing summary judgment. *See* (Docket #25 at 7). He had more than ample opportunity to amend his pleading to name these deputies as defendants if he intended to maintain claims against them, and he did not. They will be dismissed.

### 5.    CONCLUSION

Black has raised a triable issue of fact as to his claim for First Amendment retaliation based on Clarke's Facebook posts. Unless otherwise resolved, that claim will proceed to a jury trial as scheduled for January 22, 2018 (Docket #13). As to the balance of Black's claims, the defendants are entitled to judgment as a matter of law.[10]

---

[10]One last item remains for the Court's attention. Along with their summary judgment submissions, the defendants filed a motion to seal Exhibit A to the declaration of Brian Barkow. (Docket #20). The exhibit is matrix of information summarizing "threats" made against Clarke between July 2016 and July 2017. It includes identifying information about private citizens, including names, addresses, and birthdays. The defendants contend that public disclosure

Accordingly,

**IT IS ORDERED** that Black's motion for leave to untimely file materials in opposition to summary judgment (Docket #28) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the defendants' motion to seal Exhibit A to the Declaration of Brian Barkow (Docket #20) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (Docket #15) be and the same is hereby **GRANTED in part and DENIED in part as stated in this Order**;

**IT IS FURTHER ORDERED** that Black's claims under the Fourth and Fourteenth Amendments, his claim under the First Amendment based on the airport interrogation, and his *Monell* claim be and the same are hereby **DISMISSED**; and

---

of this matrix could jeopardize ongoing investigations, provide assistance to individuals hostile to Clarke or Milwaukee County, and bring unwanted attention to the citizens whose identifying information is included. *Id.* Black opposes sealing, arguing there is no expectation of privacy for people who make statements online and that, in any event, the matrix is irrelevant to the claims at issue in this case. (Docket #23). The defendants introduced the matrix to support their arguments opposing Black's Fourth Amendment claim, which will be dismissed. *See* (Docket #24 at 1-2). Because the exhibit is not dispositive to any issue in this case, and because it includes personal, identifying information about citizens who are not parties, the Court will grant the defendants' motion to seal it. *See Goesel v. Boley Int'l (H.K.) Ltd.*, 738 F.3d 831, 833 (7th Cir. 2013) ("[T]he presumption of public access 'applies only to the materials that formed the basis of the parties' dispute and the district court's resolution'; other materials that may have crept into the record are not subject to the presumption.") (quotation omitted); *see also Baxter Intern., Inc. v. Abbott Labs.*, 297 F.3d 544, 547 (7th Cir. 2002) ("Where confidential material is non-dispositive . . . sealing may be appropriate.").

**IT IS FURTHER ORDERED** that defendants Milwaukee County and John Does One through Six be and the same are hereby **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 5th day of January, 2018.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge